IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANTHONY R. MISKEL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:14-cv-338-SMY-DGW |
| ) | |
| SCF LEWIS AND CLARK FLEETING LLC.) | |
| and M/V KATIE MAURINE, ) | |
| ) | |
| Defendants. ) | |

## ORDER

**WILKERSON, Magistrate Judge:**

Now pending before the Court is the Motion to Disqualify Plaintiff's Counsel filed by Defendant SCF Lewis and Clark Fleeting LLC, on January 26, 2016 (Doc. 70), a supplement filed by Defendant on May 24, 2016 (Doc. 113), the response filed by Plaintiff Anthony R. Miskel on June 13, 2016 (Doc. 114) and the reply thereto filed on June 22, 2016 (Doc. 118). For the reasons set forth below, the Motion is **DENIED**.

### BACKGROUND

Plaintiff, Anthony Miskel, claims that he was injured on September 26, 2012 while he was a member of the crew of the M/V Katie Maurine, a harbor tugboat, and an employee of Defendant SCF Lewis and Clark Fleeting LLC ("SCF"). Plaintiff filed a Complaint on March 17, 2014 against SCF pursuant to the Jones Act, 46 U.S.C. § 30104, and general maritime law, alleging that Defendant was negligent when a cable struck Plaintiff causing injury. SCF owns and operates a barge fleeting and harbor service business that operates on the Mississippi and Illinois Rivers in the greater St. Louis region. That business was previously owned and operated by Lewis & Clark Marine, Inc. ("L&C"), Plaintiff's previous employer, which sold the operation to SCF on

December 30, 2011.[1]  Plaintiff, along with other seamen, personnel, and executives employed by L&C also became employees of SCF upon the sale.

Plaintiff is represented by the law firm Armbruster, Dripps, Winterscheidt & Blotevogel, LLC ("Armbruster, Dripps") and by Roy C. Dripps in particular.  On November 23, 2015, Courtney C. Stirrat, who joined Armbruster, Dripps in the Fall of 2015, entered an appearance on behalf of Plaintiff (Doc. 64).[2]  Shortly thereafter, on January 26, 2016, Ms. Stirrat filed a notice of withdrawal as counsel "pursuant to Illinois Supreme Court Rule 13(2)" (Doc. 68).[3]  The pending Motion to Disqualify was filed three days later.

Prior to joining the Armbruster, Dripps law firm, Ms. Stirrat was an associate at the law firm Tonkin & Mondl, L.C.  From July 2009 to August 1, 2015, Ms. Stirrat specialized in Maritime and Jones Act defense work and represented various fleeting and barge companies including L&C.  Ms. Stirrat represented L&C in four Jones Act (or related) cases during that time period: *Dawdy v. Lewis & Clark Marine, Inc.*, case number 07-L-626, filed in Madison County Illinois on July 13, 2007 (Doc. 70-4); *Gibson v. Lewis & Clark Marine, Inc.*, case number 10-L-69,

---

[1] SCF was incorporated on December 16, 2011 in the State of Delaware (Doc. 70-11) in order to purchase the barge fleeting and harbor business from L&C.  However, SCF did not purchase L&C stock.  According to the Illinois and Missouri Secretaries of State, L&C is a going concern, incorporated in Missouri and operating in Granite City, Illinois.  Paul Wellhausen (who is the vice president of SCF) is listed as the President of L&C.  ILLINOIS SECRETARY OF STATE, www.ilsos.gov/corporatellc/CorporateLLCController (search "Lewis & Clark Fleeting, Inc.") (last visited June 29, 2016); MISSOURI SECRETARY OF STATE, https://bsd.sos.mo.gov/BusinessEntity/BESearch.aspx?SearchType=0 (same search) (last visited June 29, 2016).

[2] And again on December 15, 2015 (Doc. 65).

[3] The Court assumes that Ms. Stirrat meant to refer to Illinois Supreme Court Rule 13(c)(2).  She should have cited to Local Rule 83.1(g) instead and should have moved to withdraw instead of merely filing a notice.

filed in Madison County, Illinois on January 25, 2010 (Doc. 70-7);[4] *Meyer v. Lewis & Clark Marine*, et al., case Number 3:11-cv-16-MJR-PMF, filed in the District Court for Southern District of Illinois on January 10, 2011 (Doc. 70-5); and, *Tangman v. Lewis & Clark Marine, Inc.*, case number 11-L-445, filed in Madison County, Illinois on May 10, 2011 (Doc. 70-3). Ms. Stirrat also represented L&C's insurer, Chartis, in the case *Peebles v. Lewis & Clark Marine, Inc.*, et al., case Number 10-L-715, filed in Madison County, Illinois on July 7, 2010 (Doc. 70-6).[5] After SCF purchased L&C's barge fleeting and harbor service business, it did not retain the services of Tonkin & Mondl.[6] Finally, Ms. Stirrat represented U.S. Fire Insurance in pre-litigation activities related to an event referred to as the "ACL Breakaway" that occurred on April 20, 2013 (Doc. 79-5, p. 4). At the time, U.S. Fire Insurance's position was adverse to SCF (*Id.*). Ms. Stirrat joined the Armbruster, Dripps law firm on November 2, 2015.

Thus, prior to entering an appearance on behalf of Plaintiff Miskel, Ms. Stirrat represented L&C in four Jones Act or maritime law cases in which she conducted legal research, drafted motions, and prepared for trial. In performing these tasks, Ms. Stirrat represents that she "did not learn anything about the internal operations of former Lewis & Clark and did not receive any confidential information about the company" (Doc. 79-5, pp. 1-3) She also represented one of L&C's insurers in one case and continued to bill L&C after the December 30, 2011 sale, for legal work, through January 9, 2013 (Doc. 70-2, pp 6-21).[7] Finally, Ms. Stirrat represented another

---

[4] In that case, the plaintiff was a first mate on the M/V Katie Maurine, the tugboat at issue in this case.

[5] In *Tangman, Meyer,* and *Peebles*, the plaintiffs were represented by Mr. Dripps.

[6] Ms. Stirrat continued to represent L&C in the *Tangman* case, however, after the purchase by SCF (Doc. 79-5, p. 3).

[7] Ms. Stirrat's billing records, provided by Defendant SCF, show that the "client" is "Lewis & Clark Marine. T" (with the "T" standing for Tangman) (Doc. 70-2). There is no indication in this

insurer in a matter adverse to SCF in 2013– during that representation, SCF never objected to Tonkin & Mondl's representation of the adverse insurance company. There is no evidence that Ms. Stirrat had any interaction with Plaintiff Miskel prior to this litigation.

Paul Wellhausen, who is the majority owner and President of L&C and is now also the Vice President of SCF, represents that he met with Ms. Stirrat "to discuss strategy and the status of certain cases on a few occasions" and that one such strategy meeting occurred on October 22, 2012 (with respect to the *Tangman* case), after the sale of L&C's barge fleeting and harbor service business to SCF (Doc. 70-9, p. 5). He further states that:

> I never would have approved involvement by Courtney Stirrat as part of our legal defense team in the past had I thought that she could change sides and represent our adversary in a seaman's injury case after we had confided in her as we did regarding strategy for the defense of these cases and about various details concerning the inner workings of our business that we do not disseminate publicly, let alone discuss with people who oppose us in court. I thought our lawyer was someone that we could and properly should confide in without fear that she could later turn against us and use the knowledge that she had gained from our professional relationship for the benefit of our adversary. (Doc. 70-9, p. 6).

In addition, Tom Wayne, who likewise was an executive with L&C who handled legal claims against L&C and continued in that role with SCF, states that in representing L&C, Ms. Stirrat "developed intimate knowledge of the business's training practices, safety practices, and personnel records, . . . [and] participated in discussions concerning [ ] strategy" (Doc. 70-8, p. 3). He likewise was dismayed at Ms. Stirrat's jumping ship (*Id.*).

The question before the Court is whether Ms. Stirrat, and by extension Armbruster, Dripps and its other attorneys, should be disqualified from representing Plaintiff in this matter. On February 16, 2016, a hearing was held on the Motion in which the parties discussed the possibility

---

record that Ms. Stirrat ever billed SCF for work on the *Tangman* case or that any judgment or settlement in that case was made or paid by SCF (or that Tangman himself ever worked for SCF).

of discovery related to this motion (Doc. 76). That request for discovery was denied on May 23, 2016 (Doc. 112) and this Order now follows.

## DISCUSSION

The parties first argue about what standard governs this dispute, a standard articulated by the Seventh Circuit Court of Appeals, most notably in *Analytica, Inc. v. NPD Research, Inc.*, 708 F.3d 1263, 1266 (7th Cir. 1983), or the standards contained in the Rules of Professional Conduct adopted by the Supreme Court of the State of Illinois and adopted by this Court via Local Rule 83.2(b). According to *Analytica*,

> [A] lawyer may not represent an adversary of his former client if the subject matter of the two representations is 'substantially related,' which means: if the lawyer could have obtained confidential information in the first representation that would have been relevant in the second. It is irrelevant whether he actually obtained such information and used it against his former client, or whether – if the lawyer is a firm rather than an individual practitioner – different people in the firm handled the two matters and scrupulously avoided discussing them.

*Id*. at 1266. As explained in *LaSalle Nat. Bank v. Lake County*, 703 F.2d 252 (7th Cir. 1983), this "substantial relationship" test was meant to embody the substance of Canons 4 and 9 of the A.B.A. Code of Professional Responsibility. *Id*. at 255.[8] In employing the test:

> First, we must determine whether a substantial relationship exists between the subject matter of the prior and present representations. If we conclude a substantial relationship does exist, we must next ascertain whether the presumption of shared confidences with respect to the prior representation has been rebutted. If we conclude this presumption has not been rebutted, we must then determine whether the presumption of shared confidences has been rebutted with respect to the present representation. Failure to rebut this presumption would also make the disqualification proper.

---

[8] The "code" itself has been replaced by the modern Rules of Professional Conduct. Canons 4 and 9 correlate with current Rules on the appearance of impropriety and confidences and secrets. *See* MODEL RULES OF PROF'L CONDUCT, Correlation Tables, (2015). Canon 4 states "A lawyer should preserve the confidences and secrets of a client" and Canon 9 states that "A lawyer should avoid even the appearance of professional impropriety." CHARLES W. WOLFRAM, MODERN LEGAL ETHICS 1047 and 1079 (West Publishing Co. Practioner's ed. 1986).

*Cromley v. Board of Educ. Of Lockport Tp. High School Dist. 205*, 17 F.3d 1059, 1064 (quoting *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir. 1983)). Thus, in *Analytica*, an attorney who represented a party in a stock transfer deal was not permitted to represent an adverse party in an antitrust case. 708 F.2d at 1265. More recently, in the only case that cites to *Analytica* in this District, the substantial relationship test disqualified an attorney from representing a plaintiff in a products liability/personal injury action where an attorney from the same firm represented the defendant in lobbying efforts regarding the same (or similar) product at issue. *Stallings v. Black & Decker Corp*, 2006 WL 3497314 (S.D. Ill. 2006).

Illinois' Rule of Professional Conduct 1.9 governs the same area, a lawyer's duty to a former client:

> **(a)** A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.
>
> **(b)** A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
>
>> (1) whose interests are materially adverse to that person; and
>>
>> (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent.
>
> **(c)** A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
>
>> (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or
>>
>> (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

(*Id.*).

Rule 1.9 is less demanding than the standard articulated in *Analytica* and specifically allows for informed consent. The Rule also softens the more draconian effects of that case by allowing certain exceptions or considerations. Thus, in comment 2, it is noted that:

> On the other hand, a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a factually distinct problem of that type even though the subsequent representation involves a position adverse to the prior client.

And, in comment 3, a distinction is made with respect to corporations:

> In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation. A former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter. A conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services.

This Court will employ the Illinois Rules of Professional Conduct which have been applied by this District in matters involving attorney discipline and which govern the conduct of attorneys practicing in this District. *See Murphy v. City of East St. Louis, Illinois*, 2014 WL 1345294 (S.D. Ill. 2014); *Alford v. Rents*, 2010 WL 4222922 (S.D. Ill. 2010); *Bankcroft v. Bayer Corporation*, 2009 WL 3156706 (S.D. Ill. 2009). In light of the adoption of the Illinois Rules of Professional Conduct by this Court's Local Rules, any analysis of the duty that Ms. Stirrat owed to SCF would be governed by Rule 1.9. *See Lawline v. American Bar Association*, 956 F.2d 1378, 1381 n.1 (1992). Of course an analysis under either *Analytica* or Rule 1.9 begins with the threshold question of whether SCF is rightly a "former client" of Ms. Stirrat.

Plaintiff represents that "Stirrat never represented defendant SCF; she did represent Lewis & Clark in four cases" (doc. 114, p. 2). As noted above, Ms. Stirrat was an attorney for L&C in

the *Tangman* case and continued to represent L&C interests after SCF purchased its barge fleeting and harbor service business and through January 2013. Plaintiff contends however, that even after the sale, the case "remained under the control of Lewis and Clark," that L&C produced records in that case, and that "SCF did not retain that firm [Tonkin & Mondl] when SCF purchased Lewis and Clark" (Doc. 114, p. 3). For its part, SCF argues that because it bought L&C's barge fleeting and harbor service business and ran it in exactly the same way, in the same location, and with the same personnel as L&C, Ms. Stirrat was its *de facto* attorney.[9]

SCF's conclusion is based on the application of the "practical consequences" test used by federal courts to determine if an attorney/client relationship continues from one entity to another. *Tekni-Plex, Inc. v. Meyner and Landis*, 674 N.E.2d 663, 668 (N.Y. 1996) ("When ownership of a corporation changes hands, whether the attorney-client relationship transfers as well to the new owners turns on the practical consequences rather than the formalities of the particular transaction."). In looking at whether the attorney-client privilege would transfer from one entity to another, "a court should sift the facts and circumstances involved" and not merely focus of company labels and legal formalities. *Ramada Franchise System v. Hotel of Gainsville Associates*, 988 F.Supp. 1460, 1464 (N.D. Ga. 1997). If the transaction is merely an asset transfer, privilege would not transfer; however, if a successor stands in the shoes of the predecessor, then the privilege, as it relates to the ongoing business, would transfer. *Orbit One Communications, Inc. v. Numerex Corp.*, 255 F.R.D 98, 104 (S.D.N.Y. 2008); *USI Insurance Services, LLC v. Ryan*, 2014 WL 3054278 (N.D. Ind. 2014) (finding that privilege transferred between two insurance companies where the purchaser "conducts the same type of insurance business, from the same location, led by the same leader [ ], employing most of the same

---

[9] *De facto* because SCF has produced no employment or engagement agreement between Ms. Stirrat or Tonkin & Mondl and SCF.

Page **8** of **11**

employees, and serving the same clients"); *UTStarcom, Inc. v. Starent Networks, Corp.*, 2009 WL 4908579 (N.D. Ill. 2009) (finding that privilege transferred to purchaser of business unit that retained a distinct name, numerous employees, that continued in the same location, and provided the same products and services).

In this case, it is undisputed that SCF continued operating L&C's barge fleeting and harbor service business with little to no change: it employed the same personnel, continued operations from the same location, it provided the same services, and it maintained the same fleet. The practical consequence of SCF's purchase was merely to change the name on the sign above the offices – no substantial change was made to the operation of the barge fleeting and harbor service business. As such, the attorney-client privilege between Ms. Stirrat and L&C transferred to SCF and she owes SCF the same duty to a former client as she would owe to L&C.

Plaintiff's arguments to the contrary are creative but without merit. First, Plaintiff's reliance on the Illinois State Bar Association's Advisory Opinion (Doc. 114-13) is surprising because the opinion relied in part on the canons and code that Plaintiff rejects as controlling this matter. The opinion, moreover, stands for the same proposition as above, that a mere transfer of interests or assets do not lead to a transfer of the attorney/client privilege. Second, Plaintiff's reliance on *ACE American Ins. Co. v. Sandberg, Phoenix & Von Gontard, P.C.*, 900 F.Supp.2d 887 (S.D. Ill. 2012) is likewise misplaced. In the case quoted by Chief Judge Michael J. Reagan (and reprinted in Plaintiff's brief), the Illinois Court of Appeals was concerned with what duty an attorney for the executor of an estate owed to potential beneficiaries of that estate; the court concluded that no attorney/client relationship existed between the attorney and beneficiaries and that because legal-malpractice claims cannot be assigned in Illinois, any suit by the beneficiaries against the attorney must fail. *Grimes v Saikley*, 904 N.E.2d, 183, 196 (Ill. App. Ct. 2009).

Again, the premise of this conclusion is that an interest (or potential interest) in assets alone does not confer with it the attorney/client relationship and would not permit a malpractice suit by a third (and potentially adverse) party. Such a conclusion is consistent with the finding above. Finally, Plaintiff relies on a policy argument: that requiring an attorney to pay attention to the sales and purchases of companies that they worked for would be burdensome. Such a consideration, however, is irrelevant to these specific proceedings as Ms. Stirrat surely was aware that L&C had sold its barge fleeting and harbor service business to SCF.

Now, to the main question. The Seventh Circuit notes that "although the court's duty is to safeguard the sacrosanct privacy of the attorney-client relationship, it must also be recognized that disqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Cromley v. Board of Education of Lockport Township High School District 205*, 17 F.3d 1059, 1066 (7th Cir. 1994) (quotation marks and citations omitted). Such a measure is not necessary in this matter. While the Court find's Ms. Stirrat's entry of appearance in this matter troubling, disqualification of the Armbruster, Dripps law firm is not warranted. Ms. Stirrat represented L&C (and by extension SCF) in similar cases to the case at bar. Comment 2 to Rule 1.9 states that "a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a factually distinct problem of that type even though the subsequent representation involves a position adverse to the prior client." This is the exact situation here. Plaintiff is suing SCF pursuant to the Jones Act, a common enough claim, and makes factual claims that are distinct from any matter in which Ms. Stirrat was L&C's attorney. While the Court is mindful that Ms. Stirrat may be privy to certain general litigation strategies, there is no showing that she was privy to "confidential factual information as would normally have been

obtained in the prior representation" that "would materially advance the client's position in the subsequent matter." ILLINOIS RULES OF PROFESSIONAL CONDUCT 1.9, cmt 3. Ms. Stirrat simply has switched sides – such an act should not lead to either her or her new firm's disqualification in this matter. In light of this conclusion, it is unnecessary to discuss the parties arguments related to gamesmanship and bad faith.

## CONCLUSION

For the foregoing reasons, the Motion to Disqualify Plaintiff's Counsel filed by Defendant SCF Lewis and Clark Fleeting LLC, on January 26, 2016 (Doc. 70) is **DENIED**. Ms. Stirrat's Notice of Withdrawal (Doc. 68) which is construed as a Motion to Withdraw is **GRANTED**.

**IT IS SO ORDERED.**

**DATED: June 30, 2016**

**DONALD G. WILKERSON**
**United States Magistrate Judge**